## IN THE MATTER OF THE ATTACHMENT OF GEORGE B. TAYLOR ET AL.

Argued March 30, 1898—Decided June 13, 1898.

A writ of *certiorari* was duly served upon the clerk of a municipal body while in session, under circumstances that showed satisfactorily that the members of that body understood its general purport as a judicial mandate. Certain members assaulted the clerk while he was attempting to read the writ, so that he was actually ousted from office and driven from the room, and was thereby prevented from obeying the writ, which was itself lost or destroyed during the disorder. *Held,* that the members who thus interfered with the clerk in the performance of his duties under the writ, were guilty of a contempt of the court from which the writ had been issued.

On rule to show cause why an attachment for contempt should not be issued against George B. Taylor et al.

Before Justices DEPUE, VAN SYCKEL and GARRISON.

For the prosecution, *Henry M. Snyder, Jr.*, and *David J. Pancoast.*

For the defendants, *Edwin G. C. Bleakly, George H. Peirce* and *Mark R. Sooy.*

The opinion of the court was delivered by

DEPUE, J. This is a rule to show cause why the respondents should not be attached as for a contempt of this court

for resisting, interfering with or destroying a writ of *certio-rari.* The writ was addressed to Thaddeus P. Varney, clerk of the city of Camden, and directed him to certify and send to the Supreme Court the resolution by which the city council of the city of Camden proposed to unseat the prosecutor. The said Varney, although duly served with the said writ, was prevented from obeying its mandate. The question with respect to these respondents is so concisely stated by their counsel, in his supplementary brief, that its opening paragraphs will be cited *verbatim:*

"In order to appreciate the force of the testimony in this case, it is necessary to know the situation as it existed when the writ of *certiorari* was brought into the council chamber. The order of the proceedings was as follows: The newly-elected members of council were sworn in ; George B. Taylor, one of the respondents, was elected president; the Rev. Dr. Handley offered prayer; thereupon, Harry C. Kramer, another of the respondents, was elected clerk. E. G. C. Bleakly was appointed the legal adviser of the city ; the acting city clerk, Thaddeus P. Varney, refused to administer the official oath to Mr. Bleakly. Councilman Silvers then offered a resolution to strike the name of John S. Roberts from the roll and add the name of Dr. Shafer. This resolution, with the election returns from the Third ward, was sent to the clerk's desk to be read. The reading was tedious, and the audience became restless and noisy ; there were laughing and talking in the gallery and on the floor of the chamber; some were denouncing what they characterized as an attempt on the part of the old council to steal the seat of Mr. Hatch ; others were criticising the action of Mr. Varney in refusing to administer the oath of office to Mr. Bleakly; others were complaining of what they described as Mr. Varney's dilatory tactics. During the reading of the returns there was disclosed an error in the date of one certificate, whereupon some-one in the audience exclaimed, 'Another Varney trick !' At or about this time, Councilman Sayrs, who was standing in the open space in front of the clerk's desk, was seen to move

hastily toward the door through which Mr. Snyder came with the writ of *certiorari;* as they met, Mr. Snyder said to Mr. Sayrs, ' Get this to the clerk's desk as quickly as possible.' Instantly there were cries, in at least one section of the room, ' Don't let him read it,' ' Stop him,' ' Put him out.' As Mr. Sayrs advanced to the clerk's desk, he said, 'A writ from the Supreme Court.' Mr. Varney took the writ, turned toward the presiding officer, and said, ' Mr. President, a writ of *certiorari* from the Supreme Court,' to which it is claimed the president replied, ' Proceed with the regular order of business.' Thereupon, according to the testimony of Mr. Varney, he said, ' Mr. President, a writ of *certiorari* from the Supreme Court, signed by Justice Garrison and William Riker, clerk.'

" Here arises the first and most important question in this case : Did either of the three respondents, Taylor, Kramer and Hatch, hear these announcements ? Did they hear what Sayrs said to the clerk ? Did they hear what the clerk said to the presiding officer ? Were they duly apprised of the fact that there was a writ of *certiorari* in the council chamber ? "

In addition to this very accurate description, it is well that the causes that led up to the allowance of the writ of *certiorari* and the manner of its procurement be briefly stated : The two factions spoken of in the proofs as the " Republican party" and the " Committee of One Hundred " had been opposed to each other at the municipal election a year previously. At this election Roberts was the candidate of the former and Shafer of the latter party. Roberts was returned elected by the board of canvassers, but, upon proceedings taken under the Werts Election law, that election was set aside and a new one ordered. At this election, Shafer, who was practically the only candidate, was declared elected and came to city council with his certificate thus obtained. The Republicans, having a working majority of city council, declared Roberts to be duly elected, by virtue of the power conferred by the charter of the city of Camden upon council, to be the judge of the election of its own members. A year later, when the Committee of One Hundred carried twelve of

the nineteen members of council, the first action it proposed to itself was the dropping of the name of Roberts from the roll of members and the substitution of that of Shafer, but the case of *Kendell* v. *City of Camden,* 18 *Vroom* 64, having decided that the power of city council thus to judge of the election of a member was exhausted by a single exercise of it, counsel for Roberts, Henry M. Snyder, applied to the main branch of the Supreme Court for a writ of *certiorari* to remove into that court any motion or resolution that might be offered tending to unseat Roberts. This application was refused by the court upon the ground that there was no proof of the proposed violation of the prosecutor's rights. Counsel was, however, informed by the court that, upon furnishing such proof, the *allocatur* could be had. This was the juncture of affairs that immediately preceded the scene described in the brief of counsel for the respondents, cited above, to which should be added that the resolution to unseat Roberts had been canvassed among the Committee of One Hundred, decided upon by its leaders and somewhat elaborately prepared in advance, showing that it was deemed to be the thing of paramount political importance at the meeting about to be held. It was this resolution that was being read when the writ of *certiorari* was served upon Clerk Varney, it was this resolution the reading of which was insisted upon notwithstanding the service of the writ upon the clerk, and it was apparently for the clerk's failure to ignore the writ and to continue reading this resolution that he was assaulted, forced from his desk and driven from the room, his place as clerk being taken by one of these respondents; and yet, after order had been restored, the reading of this resolution was never continued, nor was there, according to the respondents' testimony, any renewal whatsoever of the purpose to pass the motion that had been so conspicuously rife prior to the service of the writ.

This circumstance, which is entirely uncontradicted and is practically unexplained, is consistent with no other theory than that the service of the paper upon Varney was in some

way responsible for this sudden change of policy, for, after the confusion incident upon the assault upon the clerk had subsided—during which Mr. Hatch, who had been a member of council, caused himself to be sworn in as mayor—a vote was taken to fill the vacancy in city council thus occasioned. Upon this roll-call either the name of Roberts or of Shafer must have been called or else the name of both omitted, either of which occurrences must have drawn attention to the interrupted business of unseating Roberts; and as order was now restored, as Varney had been expelled as clerk and Kramer installed in his stead, and as the opposition had either entirely disappeared or subsided, there is no conceivable reason why the programme agreed upon should not have been carried out, unless something had happened that, in the opinion of the leaders of the dominant party, made it inexpedient to proceed with the unseating of Roberts. Nothing had happened if the confusion had been occasioned by mere trickery; nothing prevented the proposed action if the conduct of Varney was part of a scheme or the paper that he had attempted to read was a mere piece of fraud. We must, as reasonable minds, assume that the marked change of front was occasioned by the service of the paper upon the clerk. This stands as an established and otherwise inexplicable fact. Deeming this to be so, it is not necessary to find that these three respondents, at the time of the destruction of this writ, knew its precise nature or that they aided in treating it with contumely, knowing that it was a writ of *certiorari*. They say they did not, and it is highly probable that such was the case. They knew enough, however, of its nature not to go on with the unseating of Roberts, and, in the positions they held, each was peculiarly charged with the duty of finding out what sort of process had been served upon the body and what it required of them to do. Such an inquiry would have developed the fact that the writ, while reading which the clerk had been assaulted, directed the clerk of their body to make a specific return of the resolution then before the house. Having prevented either the reading of this writ or the per-

formance of his duty by the clerk, their own duty in the premises became perfectly clear, if they would absolve themselves free from contempt of the process of this court. If this be not so, then all that is necessary to bid defiance to the law is to prevent the reading of its prerogative writs and make no further inquiry about the matter. This cannot be so. The service of this writ was perfect. It was served upon the body whose action it sought to control, while it was in session, and upon the clerk, to whom it was directed, while he was in the performance of his official functions. Furthermore, the conduct of the clerk was faultless. He suspended what he was doing in order to acquaint the body with the nature of the new duties that had arisen.

When a writ, regularly issued by this court, is served in a faultless manner upon the clerk of a municipal body while in session, under circumstances that show that the members of that body have an understanding of its general purport, as these respondents unquestionably had, the mandates of the writ may not be ignored with impunity by a mere general denial of actual knowledge or of specific intent.

Taylor was the president of city council. His breach of duty is so palpable and gross as to need neither demonstration nor comment. Kramer was a factional leader of unquestioned influence, who took advantage of the proceedings occasioned by the clerk's performance of his duty in reading the writ, to intrude himself into the office without either taking up the suspended duty of making the return or of ascertaining what was required of him by a decent regard of the premises. Hatch was the admitted leader of the triumphant party, whether he be regarded as a member of city council or as mayor-elect. He was familiar with and largely responsible for the party programme. His intelligence and activity are unquestioned. His duty to the body he represented and to this court are to be measured by his possession of those qualities. He was actually present in the midst of the disturbance, saw the clerk assaulted and driven from his place, knew that the programme to unseat Roberts was abandoned and must

have understood the cause of it. While this was occurring he caused himself to be sworn in as mayor, assumed the authority of that office, exercised it and was obeyed, but, after .order was restored he never, so far as this case discloses, instituted that inquiry which would certainly have led to his ascertainment of his duty in the premises, which would have been, measurably at least, an atonement for any active interference he may inadvertently have been guilty of. This was his duty as part of the role he had assumed. One who assumes, under such circumstances, to leadership cannot avoid the result of its responsibilities.

The contempt of the writ of this court and the evasion of its mandate are directly traceable to the conduct of these three officials. Under these circumstances it is not necessary to find, in the face of their denial, that they personally committed actual assault and battery upon Clerk Varney while he was reading or attempting to read this writ, or that they seized and tore the writ while struggling for its possession. Those are, at best, but details, and if they did not have any existence it does not detract from the duty of the respondents or serve to excuse them for its non-performance.

The mass of testimony taken under this rule has been carefully considered and leaves upon the mind the abiding conviction that the conduct of these respondents, each in his own way, set at naught the command of this court, ignored its authority and set an example that, if followed, means the substitution of lawlessness for law and the end of judicial control over municipal bodies.

The attachment against the defendants Taylor, Hatch and Kramer will issue, and for this purpose the rule to show cause is made absolute. As to other respondents the rule is dismissed, without costs.